2006-NMCA-144

149 P.3d 579

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Peter Rudy PAIZ, Defendant–Appellant.**

No. 25,013.

Court of Appeals of New Mexico.

Sept. 21, 2006.

Certiorari Denied, No. 30,052,
Nov. 29, 2006.

Patricia A. Madrid, Attorney General, Patricia Gandert, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Judge.

{1} Defendant was convicted of multiple counts of criminal sexual contact of a minor (CSCM) in the third degree, multiple counts of criminal sexual penetration (CSP) in the first degree (child under thirteen), and two counts of bribery or intimidation of a witness, as well as a single count of attempted CSP in the first degree (child under thirteen). On appeal, Defendant raises the following issues: (1) whether the district court erred in denying a motion to compel the victims to submit to psychological evaluations, (2) whether the victims' medical records should have been provided in discovery, (3) whether the district court erred in admitting testimony on post-traumatic stress disorder (PTSD), (4) whether examinations of the victims should have been excluded, (5) whether lesser-included offense instructions should have been given, and (6) whether prosecutorial misconduct effectively denied Defendant a fair trial. Because we determine that no error occurred, we affirm Defendant's convictions.

## BACKGROUND

{2} Defendant's convictions stem from events that occurred between 1991 and 1996, when the victims, A.D. and J.D., were between the ages of three and eleven. During that period of time Defendant lived with the victims and their mother in a single household.

{3} A.D. and J.D. testified that after Defendant moved into their home, he began sexually abusing them. Although they reported Defendant's conduct to their mother, she did not protect them. In August 1996, J.D. called her grandmother for help. The grandmother immediately took J.D. and her brother from the house; A.D. was spending the night with a friend. The grandmother and her sister later obtained legal custody of the victims and their brother.

{4} Roughly a month after A.D. and J.D. left their mother's household, their grandmother took them to a counselor, Daniel Blackwood, to seek help with behavioral issues. Mr. Blackwood diagnosed the victims with a number of disorders, including PTSD. Approximately six months later, the victims were taken to Adrienne Larkin, a clinical psychologist who specialized in individual psychotherapy. She also diagnosed A.D. and J.D. with PTSD and confirmed that their symptoms were consistent with sexual abuse. In addition to seeing Mr. Blackwood and Dr. Larkin, A.D. received counseling from Clair Neilsen at Hogares, a treatment facility for children and adolescents. Ms. Neilsen similarly concluded that A.D. suffered from PTSD, consistent with sexual abuse.

{5} The sexual abuse was not immediately reported to the police. Rather, the victims' grandmother elected to wait until guardianship proceedings had been concluded, which resulted in a lapse of approximately one year from when the children were removed from their mother's household. In August 1997, the authorities were notified and Safehouse interviews were conducted to facilitate the criminal investigation. In October 1997, A.D. and J.D. were taken to a medical doctor, Dr. Renee Ornelas, for physical examinations. Dr. Ornelas observed no abnormalities, but opined at trial that the victims' conditions were consistent with the reported sexual abuse.

{6} The defense was based on the theory that the allegations of abuse were fabricated by the victims, because they did not like Defendant and they wanted him to leave their household. Primarily, as developed through the testimony of the defense expert, the defense characterized the victims' PTSD as consistent with other traumas in their lives. Defendant also took the stand, denying that any improper contact had occurred.

{7} The jury rejected Defendant's theory, returning guilty verdicts on three counts of CSCM in the third degree, three counts of CSP in the first degree, one count of attempted CSP in the first degree, and two counts of bribery or intimidation of a witness.

Defendant was sentenced to forty-five years, with nine years suspended, for an actual sentence of thirty-six years of imprisonment. This appeal followed.

## DISCUSSION

### A. Psychological Evaluations of the Victims

{8} Shortly before trial, Defendant filed a motion to allow his defense expert to conduct forensic psychological evaluations of the victims. The district court denied the motion on grounds of timeliness and relevancy. Defendant challenges these determinations on appeal.

{9} We will begin with the timeliness of the motion. Following an earlier appeal to this Court, this case was remanded on September 12, 2002, for retrial. Defendant did not file the motion until September 17, 2003, twelve days before the second trial. Because of the short time frame, the district court was unable to schedule a hearing on the motion before trial. The motion was heard and denied on the opening day of trial. Under such circumstances, we believe the district court could reasonably have denied the motion because it was untimely. Cf. State v. Aragon, 1997–NMCA–087, ¶ 22, 123 N.M. 803, 945 P.2d 1021 (stating that, "as a general rule, a motion for a continuance filed at the last minute is not favored"); State v. Robertson, 90 N.M. 382, 383, 563 P.2d 1175, 1176 (Ct.App.1977) (upholding the denial of a motion for a continuance in order to obtain a polygraph examination, where the motion was filed immediately before trial despite earlier opportunity to resolve the matter).

{10} Even if the motion had been timely, Defendant made an inadequate showing of support. At a minimum, the movant must demonstrate a specific basis or a compelling need for a psychological evaluation of a victim. See State v. Ruiz, 2001–NMCA–097, ¶¶ 39–40, 131 N.M. 241, 34 P.3d 630 (observing that either a "specific basis" or a "compelling need" is required in this context). Defendant sought forensic psychological examinations of A.D. and J.D., either by his own expert or by an expert appointed by the court, in order to confront the State's experts' non-forensic diagnoses of PTSD and their opinions that the PTSD was consistent with sexual abuse. Defendant contends that forensic examinations were necessary because the State's experts' diagnoses were "treatment diagnoses" and were therefore "problematically unscientific," and also that the testimony of a forensic expert would "confront the State's evidence." As shown later in this opinion, we reject Defendant's argument that the testimony of the State's experts was "problematically unscientific." We therefore see no support for Defendant's motion on that ground. The motion was not viable for other reasons as well.

{11} Defendant's expert and the State's experts and other witnesses testified at length about other traumatic events with which the victims' PTSD was or may have been consistent and to which their PTSD could have been related. In addition, Defendant did not satisfy his burden to show by an offer of proof or otherwise how a present evaluation for PTSD could be relevant in regard to whether the PTSD suffered years back would be consistent with traumatic events other than or in addition to sexual abuse. See State v. Slayton, 52 N.M. 239, 243, 196 P.2d 734, 736 (1948) (holding that the district court did not err in excluding evidence where the defendant failed to disclose a purpose to show specific acts of violence and failed to make an offer of proof); State v. Fernandez, 117 N.M. 673, 681, 875 P.2d 1104, 1112 (Ct.App.1994) (holding it was not error to reject "[a]n offer of proof stated in mere conclusory terms" and that fails to "clearly identify the relevance of the evidence"). We fail to see any support for Defendant's motion and we see no prejudice from its denial. It is unclear what, if anything, could have been gained from the requested psychological evaluations.

{12} Defendant nevertheless argues that evaluations were required in order to establish the onset of the victims' PTSD, thereby potentially rebutting the State's assertion that the victims' psychological disorders were temporally related to the alleged sexual abuse. We see no support in the record that reliable information about the onset of the victims' PTSD could have been gathered so many years after all of the suggested triggering events occurred. In light of Defen-

dant's burden as movant, *Ruiz*, 2001–NMCA–097, ¶¶ 39–40, 131 N.M. 241, 34 P.3d 630, this, too, is a critical omission. Further, besides being unsupported by evidence or an offer of proof to support this as a specific basis for the evaluation or to show a compelling need, this argument was not advanced below. We are therefore not inclined to consider it. *See, e.g., State v. Lente*, 2005–NMCA–111, ¶¶ 10–11, 138 N.M. 312, 119 P.3d 737 (declining to consider an appellate argument that was not articulated for the benefit of the district court).

{13} Finally, Defendant argues that the examinations should have been granted as a matter of fundamental fairness because the State was permitted to impeach his expert with the lack of opportunity to evaluate the victims on a first-hand basis. Our review of the transcript reveals that the district court offered to prohibit the State from pursuing this line of questioning. Defendant rejected that offer; instead, he specifically sought permission to *introduce* evidence about the lack of opportunity to conduct evaluations of the victims. This was clearly a tactical decision, which cannot provide a basis for relief on appeal. *See, e.g., State v. Bonham*, 1998–NMCA–178, ¶ 12, 126 N.M. 382, 970 P.2d 154 (observing that a defendant will not be heard to complain about the admission of evidence that he or she elected to present below), *distinguished on other grounds by State v. Traeger*, 2001–NMSC–022, 130 N.M. 618, 29 P.3d 518.

{14} We therefore reject Defendant's first assertion of error and hold that the district court did not abuse its discretion in denying Defendant's motion to allow forensic psychological evaluations.

## B. Discovery of the Victims' Medical Records

{15} Defendant contends that the district court erred in denying his motion for discovery of the victims' medical records. Where medical records are sought by the defense in cases such as this, we require "a threshold showing by [the] defendant that the records may reasonably be expected to provide information material to the defense." *Ruiz*, 2001–NMCA–097, ¶ 32, 131 N.M. 241,

34 P.3d 630 (internal quotation marks and citation omitted). Defendant's request for discovery of the victims' pediatric records was made in response to allegations that he severely beat the victims. Defendant theorized that lack of medical documentation corroborating the allegations of physical abuse would tend to discredit the victims.

{16} The district court ruled that the State was only required to produce medical records reflecting treatment for physical abuse or specifically noting that the medical care provider "either found injuries or didn't find injuries" that would suggest physical abuse. Given that Defendant was able through witness testimony to establish a lack of medical corroboration for the alleged beatings, we conclude that the district court's approach reflects an appropriate balance between Defendant's interest in obtaining material evidence and the victims' interest in maintaining a degree of privacy. *See id.* ¶ 36 (observing that the production of medical records requires a balancing of the interests of the child-victim against the interests of the defense).

{17} Defendant further contends that the district court erred in failing to review the victims' medical records in camera. Defendant's assertion that he requested in camera review of the victims' medical records is unsupported. The portion of the transcript that Defendant has cited deals with a separate discovery dispute, whereby defense counsel sought in camera review of any counseling records that might have been withheld by the State. The transcript contains no request for in camera review of the victims' medical records. The district court's failure to conduct such a review sua sponte does not provide a basis for reversal. *See State v. Martinez*, 97 N.M. 316, 318, 639 P.2d 603, 605 (Ct.App.1982) ("The trial court is not to be held in error for failing to conduct an in camera hearing sua sponte."). *Compare Ruiz*, 2001–NMCA–097, ¶ 36, 131 N.M. 241, 34 P.3d 630 (requiring in camera review of medical records where such review was specifically requested below), *with State v. Baca*, 115 N.M. 536, 541–42, 854 P.2d 363, 368–69 (Ct.App.1993) (rejecting a discovery challenge where the defendant failed to request

in camera inspection of the disputed material).

## C. Expert Testimony Concerning PTSD

{18} As briefly described earlier in this opinion, the State called three of the victims' counselors to testify at trial: Daniel Blackwood, Adrienne Larkin, and Clair Neilsen. After describing their observations, each of these witnesses confirmed that the victims suffered from PTSD and opined that their symptoms were consistent with sexual abuse. Defendant challenges the admission of this testimony on the following grounds: (1) lack of scientific basis; (2) problematic sources of background information; (3) inappropriate commentary; and (4) impermissible vouching. We address each in turn.

### 1. Scientific Basis

{19} Defendant attacks the scientific basis for the State's PTSD evidence, asserting that the diagnoses were not "forensic" in nature and were therefore derived from flawed methodologies.

{20} More particularly, Defendant contends that a critical distinction must be made between a therapeutic, clinical, treatment diagnosis of PTSD on one hand, and a forensic diagnosis on the other hand. According to Defendant, the former brand of diagnosis for evidentiary purposes is scientifically unsound because the counselor does not question the truth of what is reported by the victim, assumes the truth of the statements without looking beyond the statements and investigating the truth or falsity of the statements, and is actually required to believe the truth of what the victim reports, thereby having questionable scientific reliability and underpinning. Defendant asserts that Rules 11–401 and 11–701 NMRA and the cases of *Daubert* and *Torres* required the district court to exclude the testimony of the counselors who testified for the State. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *State v. Torres*, 1999–NMSC–010, ¶ 35, 127 N.M. 20, 976 P.2d 20 (holding admission of results of horizontal gaze nystagmus (HGN) testing without showing of evidentiary reliability in conformity with the *Alberico–Daubert* standard was error).

{21} The New Mexico Supreme Court has definitively addressed the admissibility of expert testimony on the subject of PTSD. In *State v. Alberico*, 116 N.M. 156, 173, 861 P.2d 192, 208–09 (1993), following an exhaustive review that does not bear repetition here, the Court determined that "PTSD testimony is grounded in valid scientific principle ... [and] in basic behavioral psychology." Our Supreme Court also specifically noted the scientific validity and reliability of the application of standard diagnostic criteria, as set forth in the American Psychiatric Association's "Diagnostic & Statistical Manual of Mental Disorders" (DSM). *Id.* at 159, 173, 861 P.2d at 195, 208. Based on these determinations, the Court concluded that qualified experts are permitted to opine that alleged victims of sexual abuse suffer from PTSD, and that the symptomatology associated with the PTSD is consistent with sexual abuse. *Id.* at 178, 861 P.2d at 213–14. To the extent that Defendant's attack on the scientific validity of PTSD testimony represents an invitation to depart from these principles, we must decline the invitation. *See generally State ex rel. Martinez v. City of Las Vegas*, 2004–NMSC–009, ¶¶ 20–22, 135 N.M. 375, 89 P.3d 47 (observing that the Court of Appeals is bound by New Mexico Supreme Court precedent). The State's experts in the present case gave PTSD diagnoses for each victim, and testified that the bases for the diagnoses were consistent with the standard DSM criteria for PTSD and were consistent with sexual abuse.

{22} More specifically, Defendant contends that the testimony was scientifically unreliable on the ground it was premised on self-reporting by the victims to a counselor who must assume or believe the truth of the reports. Defendant cites several articles that he believes support the view that forensic-based opinions are neutral, providing an objective evaluation, while treatment-based opinions are not neutral and can all too easily be based on statements emanating from intentional lying or adult influence. Defendant further asserts that forensic-based assessments are superior because they look into

the truth of a victim's statements, whereas treatment-based assessments are inferior because the ultimate diagnosis is not "based on administration of peer-reviewed and normative testing." Referring to *Torres*, 1999–NMSC–010, ¶ 30, 127 N.M. 20, 976 P.2d 20, in which the Supreme Court ruled that HGN testing constituted scientific evidence that must meet the test of evidentiary reliability under *Daubert* and *Alberico*, Defendant asserts that a treatment-based assessment cannot survive scientific reliability. He grounds this assertion in another assertion that the State is unable to "show that the outcome (the diagnosis) was reached with reliance upon *scientific* principles to provide a connection between the witnesses' observations . . . and some probability of the witnesses' factual conclusion (the diagnosis)." Thus, according to Defendant, the State's experts' observations and conclusions were not relevant, because there existed no factual verification to support those observations and conclusions.

{23} We are not persuaded by Defendant's arguments for several reasons. First, the record does not show that the counselors actually formed beliefs that what the victims reported was true and then based their individual diagnosis on those beliefs. Defendant's claim is only a broad, general assertion, namely, that therapeutic, clinical counselors who treat victims of sexual abuse must believe in the truth of the victims' reports and, therefore, the diagnoses of PTSD are scientifically suspect because the counselors are unable to show that the statements are true, thereby losing a critical premise behind the diagnoses.

{24} Second, our Supreme Court in *Alberico* saw the weakness associated with self-reporting and the distinction between clinical credibility and objectively verifiable truth. 116 N.M. at 174–75, 861 P.2d at 210. Acknowledging as a drawback in allowing PTSD testimony the fact that "the diagnosis relies in large part upon what the alleged victim reports to the examining psychologist[,]" the Court stated that this concern "can be cured by cross-examination addressing the point that the diagnosis is based upon what the complainant says, not upon an inde-

pendent evaluation of her truthfulness." *Id.* at 174, 861 P.2d at 210. We adhere to this assessment by the *Alberico* Court.

{25} Third, Defendant fails to provide any authority that holds that a treatment-based diagnosis of PTSD does not satisfy scientific principles because it is based on an assumption that the victims' statements are true. As we just indicated, *Alberico* relegates concerns about this to cross-examination.

{26} Fourth, the principles enumerated in *Torres* do not suggest, much less compel, the result Defendant advances. The State's experts' PTSD testimony meets the *Torres* requirements. The experts were qualified; the showing that PTSD symptomatology is consistent with sexual abuse made the testimony relevant; and the testimony was limited to an area of specialized scientific knowledge in which the experts were qualified. *See Torres*, 1999–NMSC–010, ¶ 23, 127 N.M. 20, 976 P.2d 20. Nothing in *Torres* supports Defendant's contention that treatment-based or clinical-based assessments cannot scientifically support a PTSD diagnosis or an opinion of its consistency with sexual abuse because the counselor assumed the truth of the victims' statements in reaching the diagnosis.

{27} Defendant also contends that the district court erred in failing to conduct a *Daubert* hearing on the scientific reliability of the State's PTSD testimony. We disagree. The district courts have "discretionary authority . . . to avoid unnecessary reliability proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted." *Lente*, 2005–NMCA–111, ¶ 8, 138 N.M. 312, 119 P.3d 737 (internal quotation marks and citation omitted). Because *Alberico* resolves any question about the general admissibility of PTSD testimony in cases of this nature and supports the admission of the specific testimony at issue in this case, we hold that the district court acted well within its discretion in determining that a *Daubert* hearing was unnecessary.

## 2. Sources of Background Information

{28} Defendant raises issues that are specific to the sources of background informa-

tion utilized by one of the State's experts, Clair Neilsen. Defendant contends that Neilsen's testimony should be regarded as both unscientific and in violation of the Confrontation Clause. Defendant argues that Neilsen relied in part on an inaccurate intake report compiled by a third party, and also on the prior assessment of a colleague.

{29} As we previously discussed in this opinion, the scientific validity of the standard diagnostic process for a PTSD diagnosis is well-established. Neilsen testified that she applied standard diagnostic procedures and formulated her own professional opinion, based on the DSM and first-hand interaction with A.D. *Alberico* provides that testimony of this nature has a sound basis in scientific principle. *See Alberico*, 116 N.M. at 169, 861 P.2d at 205. Although Neilsen may have taken the intake report and the prior assessment into consideration, these materials relate to the factual basis for her opinion, rather than the validity of her methodology. As a result, Defendant's challenge bears on the weight of Neilsen's testimony, rather than its admissibility. *Cf. Martinez v. Sw. Landfills, Inc.*, 115 N.M. 181, 185, 848 P.2d 1108, 1112 (Ct.App.1993) (noting that errors or omissions with respect to underlying facts may lessen the weight of expert testimony). Furthermore, such concerns should, as *Alberico* indicates, be handled through cross-examination. 116 N.M. at 174, 861 P.2d at 210.

{30} In addition, we do not perceive any Confrontation Clause problem. As the United States Supreme Court recently clarified, the Confrontation Clause applies exclusively to testimonial statements. *See Davis v. Washington*, —— U.S. ——, 126 S.Ct. 2266, 2274–76, 165 L.Ed.2d 224 (2006). To determine whether a statement is testimonial, we consider the context in which it was made, focusing on whether the statement was made in a law enforcement context. *See State v. Dedman*, 2004–NMSC–037, ¶¶ 29–30, 136 N.M. 561, 102 P.3d 628 (characterizing testimonial statements as statements made in the course of adversarial proceedings, and statements that are the product of investigative and/or prosecutorial inquiries by government officers). The materials with which Defendant takes issue, the intake report and the prior assessment, were prepared by Neilsen's colleagues at Hogares. The record contains no indication that either the declarants or the facility had any relationship with law enforcement, or that the documents were prepared in a manner to suggest possible law enforcement or prosecutorial abuse in order to facilitate proof in an anticipated criminal proceeding. As a result, neither the intake report nor the prior assessment can be characterized as "testimonial" in nature. We therefore conclude the Confrontation Clause is not implicated.

### 3. Commentaries

{31} Defendant also challenges a series of specific comments attributed by Defendant to the State's experts, to the effect that: (1) A.D.'s symptoms were "more consistent than inconsistent" with sexual abuse, (2) sexual abuse can cause PTSD, and (3) the chance of any given event causing PTSD increases with the frequency of occurrence. Defendant contends that each of these statements amounted to improper testimony on causation. We disagree.

{32} The first comment was made in response to a valid question, whether A.D.'s symptoms were consistent with sexual abuse. *Alberico* expressly permits this sort of testimony. 116 N.M. at 175, 178, 861 P.2d at 210, 213–14. Contextually, it is clear that the witness was not attempting to convey any opinion about the probability that sexual abuse occurred.

{33} Defendant did not object to the second and third statements on grounds that they contained improper commentary on causation. As a result, Defendant's challenge was not preserved. *See generally State v. Clark*, 108 N.M. 288, 296, 772 P.2d 322, 330 (1989) ("Generally, failure to make a timely objection to allegedly improper testimony or argument bars review of the issue on appeal."), *overruled on other grounds by State v. Henderson*, 109 N.M. 655, 789 P.2d 603 (1990), *overruled on other grounds by Clark v. Tansy*, 118 N.M. 486, 882 P.2d 527 (1994). We further note that the comments are mere generalizations. While experts such as those in the present case are prohibited from as-

signing causation in any specific case, *Alberico*, 116 N.M. at 176, 861 P.2d at 212, we are aware of no authority which purports to foreclose testimony about the general nature of PTSD. Finally, we observe that the State was not alone in eliciting generalizations; Defendant also developed testimony about common features of PTSD, including potential causes and onset characteristics. "A defendant cannot be heard to complain on appeal that he was prejudiced by evidence which he introduced into the case." *State v. Gilbert*, 100 N.M. 392, 398, 671 P.2d 640, 646 (1983); *see also Bonham*, 1998–NMCA–178, ¶ 12, 126 N.M. 382, 970 P.2d 154 (same).

#### 4. Vouching

{34} Defendant argues that the State's experts invaded the province of the jury by commenting on the credibility of the victims. While PTSD testimony is "grounded in valid scientific principle" and generally admissible "to show that the victim suffers from symptoms that are consistent with sexual abuse, it may not be offered to establish that the alleged victim is telling the truth; that is for the jury to decide." *Alberico*, 116 N.M. at 173, 175, 861 P.2d at 208, 210–11. After a careful review of the transcript, we conclude that none of the witnesses violated this prohibition. Although the experts explained that the standard method of psychological evaluation requires a degree of reliance upon self-reporting, as well as a professional assumption that the subject is responding truthfully to the clinical inquiries, the experts explained that these practices are strictly associated with their diagnostic and treatment methodologies. *See id.* at 174–75, 861 P.2d at 210. At no point did any of the experts testify that they had formulated opinions about the veracity of the allegations of sexual abuse, nor at any time did they indicate that the PTSD was caused by the reported sexual abuse. This accords with *Alberico*. As a result, we are unpersuaded by Defendant's assertions of error.

#### D. Expert Medical Testimony

{35} At trial, the State called Dr. Ornelas to testify about her physical examinations of the victims. Defendant contends that the district court erred by: (1) permitting Dr. Ornelas to describe the victims' histories, (2) concluding that Dr. Ornelas' opinion testimony was premised in valid and reliable scientific principle, and (3) failing to conduct a *Daubert* hearing.

#### 1. Recitation of Victim Histories

{36} Prior to examining the victims, Dr. Ornelas obtained histories describing the variety of sexual contact to which they had been subjected. At trial, Dr. Ornelas explained that she relies upon such histories because the scope of the examination is dictated by the types of contact involved. Dr. Ornelas then summarized the histories that she obtained in relation to A.D. and J.D., related her findings, and opined about the significance of those findings.

{37} Defendant argues that the victims' histories as to the alleged sexual contact should have been excluded from evidence. He relies on the case of *State v. Lucero*, 116 N.M. 450, 863 P.2d 1071 (1993), to support his position. *Lucero* addressed a challenge to the admission of a clinical psychologist's PTSD testimony in a sexual abuse case. *Id.* at 451, 863 P.2d at 1072. The *Lucero* Court clarified that while a qualified psychologist may testify about a victim's PTSD, including the consistency of the symptoms with sexual abuse, the expert cannot repeat unduly prejudicial victim statements. *Id.* at 454–55, 863 P.2d at 1075–76.

{38} Below, the district court concluded that *Lucero* did not present a bar to Dr. Ornelas' testimony about the victims' histories. We agree, for three reasons. First, *Lucero* applies to PTSD testimony. Dr. Ornelas did not testify on this subject. Second, *Lucero* applies to the testimony of psychologists. Dr. Ornelas did not testify in this capacity. Rather, she conducted physical examinations and testified about her findings from those examinations. Finally, the statements deemed inadmissible in *Lucero* all involved identification of the perpetrator. *Id.* at 452, 863 P.2d at 1073. Dr. Ornelas did not repeat statements of this nature.

{39} In a recent case, this Court was presented with a challenge to the repetition of victim statements by an examining physi-

cian. *See State v. Salazar,* 2006–NMCA–066, ¶¶ 4, 11–14, 139 N.M. 603, 136 P.3d 1013 (involving a pediatrician's testimony about findings from an examination), *cert. granted,* 2006–NMCERT–006, 140 N.M. 225, 141 P.3d 1279. We held such statements may be admitted, as long as the expert does not "improperly comment on the victim's credibility or testify as to her belief that the defendant was the perpetrator." *Id.* ¶ 12. At no point did Dr. Ornelas comment on A.D. or J.D.'s credibility, nor did she identify Defendant as the perpetrator. Accordingly, we perceive no error.

{40} Defendant also challenges the admission of Dr. Ornelas' testimony about the victims' histories on grounds that they were hearsay statements, and on grounds that the histories were filled with inaccuracies. We reject both of these arguments. The histories do not appear to have been offered for the truth of the matters asserted. Rather, they were offered to explain the scope of Dr. Ornelas' physical examinations. As a result, we dispute their classification as hearsay. Additionally, it appears that the histories were compiled by Dr. Ornelas' staff for the purpose of facilitating medical diagnosis or treatment. Accordingly, they fall within the hearsay exception set forth in Rule 11–803(D) NMRA. *See, e.g., State v. Massengill,* 2003–NMCA–024, ¶¶ 19–21, 25, 133 N.M. 263, 62 P.3d 354 (upholding the admission of statements made by a child-victim to medical personnel pursuant to Rule 11–803(D)).

{41} With respect to the alleged inaccuracies, we acknowledge that the histories written down may have been far less detailed than the victims' testimonial descriptions of the sexual contact. However, as previously described, Dr. Ornelas merely required general information about the type of contact reported, so that she could focus her examinations on appropriate anatomical areas and test for diseases that could have been communicated under the circumstances. To the extent the specifics of the reported sexual contact could have had an impact on her opinions, they were presented in appropriate hypothetical questions based on the victims' testimony at trial. *See generally* Rule 11–705 NMRA. Potential inconsistencies were also developed on cross-examination. We therefore perceive no impropriety.

{42} Finally, Defendant challenges the admission of the histories on Confrontation Clause grounds. We observe that an argument of this nature must be preserved. *See State v. Trujillo,* 2002–NMSC–005, ¶ 13, 131 N.M. 709, 42 P.3d 814 (refusing to address the defendant's Confrontation Clause concerns because he failed to object to the admission of evidence on confrontation grounds). Although it is not our responsibility to do so, we have scoured the record and the transcript in an effort to identify a timely and specific objection. *See generally In re Estate of Heeter,* 113 N.M. 691, 694, 831 P.2d 990, 993 (Ct.App.1992) (stating that this Court will not comb the record to find support for a party's arguments). Finding no such objection, we decline to consider Defendant's argument.

**2. Existence of a Valid Scientific Basis for Dr. Ornelas' Medical Testimony**

{43} Defendant argues that much of Dr. Ornelas' testimony should have been excluded on the ground that her "diagnosis" lacked a valid scientific basis, having been based, he contends, solely on the victims' histories alone and a lack of abnormal findings.

{44} As previously described in this opinion Dr. Ornelas' testimony was fairly limited. She described the examination process and related the histories she had obtained for the victims. She explained that both A.D. and J.D. had "normal" exams, meaning that she discovered neither physical indicia of trauma nor sexually transmissible diseases. Dr. Ornelas then opined that the "normal" examinations were consistent with the victims' histories, in light of the significant lapse of time between the alleged sexual contact and the examinations, in light of the rapid rate of healing of mucosal tissue, in light of the victims' natural physical development, and in light of ambiguity concerning the extent of penetration.

{45} Defendant's attack on the scientific basis for Dr. Ornelas' testimony appears to be focused on the sexual aspect of the abuse,

insofar as Defendant asserts that the examinations yielded no objective evidence in support of the allegations. Defendant appears to argue that the testimony should have simply been that the findings were consistent with abuse, generally, instead of consistent with the victims' histories. We are not persuaded of any error or improper testimony. Dr. Ornelas did not opine that the victims were sexually assaulted. To the contrary, Dr. Ornelas specifically disclaimed any ability to determine whether the victims had been sexually assaulted. She also explained that the normal examinations were completely consistent with the lack of sexual abuse. Because Dr. Ornelas did not testify that the normal examinations tended to prove that the victims had been sexually assaulted, no scientific basis for such a correlation was required, and the *Lucero* concerns were not present. While one might argue that prejudice outweighed the probative value of the testimony of the histories relied on by Dr. Ornelas in this case, Defendant did not pursue exclusion of the testimony along that line, nor was Rule 11–403 NMRA brought to the district court's attention on this issue.

{46} As previously stated, Dr. Ornelas' testimony was addressed as to the consistency of the normal examinations with the alleged sexual abuse. Contextually, it is clear that this consistency reflected compatibility or consonance. We note that Defendant does not take issue with the scientific validity of Dr. Ornelas' comments about the effects of time, the natural developmental, and healing processes. Insofar as these comments provided the scientific basis for her opinion that the normal test results were consistent with the victims' histories, we reject Defendant's assertion of error.

{47} Defendant also challenges the basis for Dr. Ornelas' statements about the frequency of normal examinations in cases involving sexual abuse, and about common behaviors on the part of common offenders. With respect to the former, Defendant merely sought the opportunity to conduct recross-examination and the request was granted. With respect to the latter, the district court sustained Defendant's prompt objection and no further relief was sought. As a result,

neither statement presents a basis for relief on appeal. *See State v. Laney*, 2003–NMCA–144, ¶ 34, 134 N.M. 648, 81 P.3d 591 (stating that there was no error where defense counsel objected and moved to strike testimony, which the court sustained, the defendant requested no further relief, and thus received the relief requested).

### 3. Failure to Conduct a *Daubert* Hearing

■ {48} Finally, Defendant contends that the district court erred in denying his request for a *Daubert* hearing to evaluate Dr. Ornelas' testimony. As we have previously observed, the district courts have "discretionary authority ... to avoid unnecessary reliability proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted." *Lente*, 2005–NMCA–111, ¶ 8, 138 N.M. 312, 119 P.3d 737 (internal quotation marks and citation omitted). By virtue of prior proceedings, the district court was familiar with Dr. Ornelas' qualifications and with her testimony. For the reasons stated earlier, the scientific basis for her opinions is evident. As a result, we conclude that the district court acted well within its discretionary authority in denying Defendant's motion for a *Daubert* hearing.

### E. Instructions on Lesser–Included Offenses

{49} Defendant requested that the jury be instructed on the lesser-included offense of CSCM in relation to both Count 1, attempted CSP (involving A.D.), and Count 6, CSP (involving J.D.). The district court denied the request, finding the lesser-included offenses and the instructions to have been unsupported by the evidence. Defendant challenges this determination on appeal.

■ {50} An instruction on a lesser-included offense is only warranted if there is some reasonable view of the evidence pursuant to which the lesser offense is the highest degree of crime committed. *Id.* ¶ 14. Where there is no ambiguity in a victim's testimony that could lead a rational juror to acquit a defendant of CSP but convict of CSCM, the defendant is not entitled to an instruction on the lesser-included offense. *Id.* ¶ 16. We apply a de novo review here. *Id.* ¶ 14.

{51} A.D.'s testimony provided the evidentiary support for Count 1, attempted CSP involving A.D. She specifically stated that Defendant tried to penetrate her. In light of child-victims being "extremely poor reporters" and in light of the lack of medical evidence of physical harm, Defendant contends that A.D.'s perception may have been flawed, such that mere contact was involved rather than any attempt at penetration. We cannot agree that the evidence supports this view. The transcript reveals no equivocation. A.D. clearly specified at trial that Defendant attempted to penetrate her, that he used force in the effort, and that Defendant was only unsuccessful because she was too small. Contrary to Defendant's suggestion, the fact that A.D. was a child does not give the license to reinvent her unambiguous testimony. Nor does the absence of physical injury create ambiguity. As described by Dr. Ornelas at trial, even penetration may be accomplished without causing lasting injury. In summary therefore, given the unequivocal nature of A.D.'s testimony, Defendant's request for a lesser-included offense instruction on CSCM was properly denied. *See id.* ¶ 16 (holding that the defendant was not entitled to a lesser-included offense instruction where there was no ambiguity in the victim's testimony that could lead a rational juror to acquit of CSP and convict of CSCM).

{52} Count 6, CSP involving J.D., was based on J.D.'s testimony that Defendant repeatedly awoke her at night "licking" her "down there." When asked to be more specific, J.D. indicated that he would lick her "vagina." Once again, Defendant relies on child-victims being "infamously unreliable reporters" and the lack of medical evidence of physical harm to support the theory that mere contact occurred. We are unpersuaded. As charged, the CSP involved cunnilingus, which is defined as "the touching of the edge or inside of the female sex organ with the lips or tongue." UJI 14–982 NMRA. J.D. unambiguously described licking the vagina, and there is no indication in the record that J.D. was unclear about the meaning of that term. As a matter of physiology, the described contact with the vagina went beyond "the edge ... of the female sex organ," *id.*, and as such, the licking of the vagina

unavoidably entailed penetration to some extent. *See generally* UJI 14–981 NMRA (providing physiological definitions); NMSA 1978, § 30–9–11(A) (1995) (amended 2003) (defining CSP in terms of "cunnilingus ... or the causing of penetration, to any extent ... of the genital ... openings"). Because the evidence is incapable of supporting a reasonable inference of mere contact, Defendant's requested instruction was properly denied. *See Lente,* 2005–NMCA–111, ¶ 16, 138 N.M. 312, 119 P.3d 737.

## F. Prosecutorial Misconduct

{53} Finally, Defendant contends that the prosecutor made a series of improper comments in the course of closing arguments, thereby denying him a fair trial. When an issue of prosecutorial misconduct is preserved by a timely objection at trial, we review the district court's ruling for abuse of discretion. *State v. Allen,* 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728. If no objection was raised, our review is limited to fundamental error. *Id.* "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Id.* (internal quotation marks and citation omitted).

{54} First, Defendant contends that the prosecutor's comments on credibility assessments and the burden of proof amounted to misconduct. Specifically, the prosecutor stated: "[I]f you believe the girls that he's guilty.... If you believe they were sexually abused and you believe that he did it, then we proved our case." Because no objection was raised, we apply fundamental error review. A misstatement of the law may constitute misconduct. *See State v. Taylor,* 104 N.M. 88, 96, 717 P.2d 64, 72 (Ct.App.1986) ("Counsel may not misstate the law."). However, we do not regard the prosecutor's comment as a misstatement of law. Rather, it appears to represent a shorthand description of the jury's role as evaluator of witness credibility and assessor of guilt. Although somewhat imprecise, the statement could not be said to have compromised the fundamen-

tal fairness of the proceedings. *Cf. State v. Duffy*, 1998–NMSC–014, ¶ 54, 126 N.M. 132, 967 P.2d 807 (rejecting an imprecise statement of law as grounds for relief under the rubric of prosecutorial misconduct).

{55} Next, Defendant claims that the prosecutor improperly vouched for the credibility of the victims by asserting that they would not have testified before the jury if their assertions were untrue. As an initial matter, we observe that Defendant failed to object. Secondarily, we disagree with Defendant's characterization. Generally speaking, vouching involves either "invoking the authority and prestige of the prosecutor's office" or "suggesting the prosecutor's special knowledge." *State v. Pennington*, 115 N.M. 372, 381, 851 P.2d 494, 503 (Ct.App.1993). The statement at issue did not stem from any assertion of special knowledge, personal integrity, or official prestige. Rather, it appears to constitute an appeal to popular psychology, suggesting that the victims would not have endured the trauma associated with the legal proceedings if they had not been driven in some sense by truth. Although the persuasive value of such an argument may be debatable, it does not implicate the concerns associated with vouching. *See generally id.* (observing that the prohibition against prosecutorial vouching stems from concerns that such comments may lead the jury to rest its decision on the prosecutor's personal integrity or authority).

{56} Finally, Defendant contends that the prosecutor impermissibly appealed to passion and sympathy by: (1) asserting that nothing the jury could do would diminish the mental anguish of the victims, but that the jury could "make it a lot worse"; (2) inviting the jurors to imagine whether they would have screamed, "at least in your head," if they had been similarly assaulted as young children; and (3) as characterized by Defendant, asking the jurors to give the case the same consideration as if their relatives were the victims. Although these comments were largely improper, we conclude that they were not sufficiently egregious, pervasive, or prejudicial to deprive Defendant of a fair trial.

{57} With respect to the first statement, Defendant's objection was promptly sustained, and the prosecutor was admonished to "stay away" from that line of commentary. "[T]here has been no showing that the trial court's prompt sustaining of objections and admonishments to the jury failed to cure the effect of the prosecutor's overreaching." *Allen*, 2000–NMSC–002, ¶ 100, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citation omitted). In addition, the prosecutor complied with the district court's ruling and did not pursue the matter further. Accordingly, we perceive no abuse of discretion. *See id.* (rejecting a claim of unfair prejudice where an objection to an improper closing statement was promptly sustained, and the prosecutor avoided the subject thereafter); *Duffy*, 1998–NMSC–014, ¶ 51, 126 N.M. 132, 967 P.2d 807 (reasoning that the defendant was not deprived of a fair trial when an improper statement was not emphasized by the prosecution).

{58} With respect to the second statement, about the victims screaming, Defendant objected on grounds that the prosecutor had mischaracterized the evidence by stating that Defendant would cover J.D.'s mouth. However, J.D.'s testimony provided clear evidentiary support for the prosecutor's comment. As a result, the objection was properly overruled. In his briefs to this Court, Defendant now asserts that the prosecutor's statement was objectionable because it invited the jurors to put themselves in the victims' place. Because Defendant did not advance this argument below, it is only reviewable for fundamental error. *See State v. Harrison*, 2000–NMSC–022, ¶ 29, 129 N.M. 328, 7 P.3d 478. Although the prosecution is not advised to invite jurors to empathize in this manner, we cannot agree that the comment deprived Defendant of a fair trial. *See, e.g., State v. Baca*, 1997–NMSC–059, ¶ 55, 124 N.M. 333, 950 P.2d 776 (holding that a prosecutorial comment which improperly appealed to the jury's sympathy for the victim did not rise to the level of fundamental error).

{59} The third and final statement, by which the prosecutor requested that the jurors "give [this case] the same consideration

you would ..." was cut off by an objection. Because the objection prevented the prosecutor from completing the arguably improper statement, because the objection was sustained, and because the prosecutor completed the line of argument by discouraging the jurors from basing their assessments on sympathy, we perceive no error. We further note that even if the prosecutor had been permitted to argue that the jurors should deliberate as though their children were the victims, the argument would have been a permissible response to a reciprocal appeal by Defendant. *See generally Taylor*, 104 N.M. at 94, 717 P.2d at 70 ("Where the defendant opens the door to comments by the prosecutor, such comments are invited and do not constitute reversible error, even if such comments are improper." (internal quotation marks and citation omitted)).

{60} In summary, we conclude that none of the challenged statements deprived Defendant of a fair trial, individually or collectively.

## CONCLUSION

{61} For the foregoing reasons, we reject Defendant's assertions of error. Defendant's convictions are therefore affirmed.

{62} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge and MICHAEL E. VIGIL, Judge.