This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40814**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JOSE GONZALEZ-LOPEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Conrad F. Perea, District Court Judge**

Raúl Torrez, Attorney General
Teresa Ryan, Assistant Solicitor General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**WRAY, Judge.**

**{1}** A jury found Defendant guilty of four counts of criminal sexual penetration, contrary to NMSA 1978, Section 30-9-11(D)(1) (2009). Defendant appeals and argues that a new trial is warranted because the State engaged in a pattern of questioning and made statements in closing argument that in each instance and in the aggregate resulted in prosecutorial misconduct. We conclude that the district court did not abuse its discretion in sustaining Defendant's single objection and instructing the jury to

disregard that statement, and the State's conduct did not otherwise result in fundamental error and deprive Defendant of a fair trial. We therefore affirm.

**BACKGROUND**

{2}     Defendant's appeal focuses on the State's conduct in the questioning of two witnesses and statements made in closing and rebuttal arguments. We therefore provide factual background for those portions of the trial, beginning with the State's questioning of (1) the investigating detective, both in itself and in relation to Victim's testimony; and (2) Dora, the former girlfriend of Victim's grandfather. The detective first described his techniques and processes for investigating the credibility of an alleged child victim, including the use of age-appropriate terms and sensory details. In line with the detective's testimony, during Victim's testimony, she used less technical terms for body parts and talked about how the acts felt "not good." The detective also testified about the reasons a child might delay disclosure or have difficulty reporting time frames accurately and explained that it is helpful to use major holidays or life events to "narrow down a date range." Victim later gave reasons for delaying disclosure that were consistent with those the detective had identified and testified about the timing of the charged acts in relation to school and holidays. The detective testified generally that he does not always file charges after an investigation of alleged sexual abuse, but that the steps he took in this particular investigation did culminate in filing charges against Defendant. Toward the end of the direct examination of Dora, and near the end of trial, the State asked whether Dora thought Victim was lying. Dora responded, "She is not lying."

{3}     Defendant challenges multiple statements made during the State's closing and rebuttal arguments, which we set forth below in their context, together with portions of Defendant's closing argument.[1] During closing argument, the State addressed Victim's testimony in relation to the charged time frames.

> Do we expect children to remember everything that's happened to them? Do we expect them to have a perfect memory? Do we expect an eleven-year-old who has been sexually abused by someone to remember every detail and to always know the exact dates? To talk like an adult and talk about all kinds of details of the sexual penetration? She talked like someone who has a memory of an eleven-year-old, now talking as a fifteen—still a child. *She told you the truth.* That's why the law is just in terms of date ranges—it allows you to have that range.

Defendant's closing argument focused on the jury instruction that defined the State's burden of proof: "A reasonable doubt is a doubt based upon reason and common sense—and now my most favorite words in the English language—the kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life." Defendant reviewed the evidence for the jury and pointed out Victim's memory lapses and the evidence that was not presented—like DNA—that caused

---

1The challenged statements are italicized to correspond to Defendant's appellate arguments.

Defendant to "hesitate" and raised doubts. Defendant argued that without more, Victim's testimony was not enough to convict beyond a reasonable doubt. In rebuttal, the State asserted,

> I must have missed the memo that we got to show DNA evidence, that we, we got to show some sort of examination from a nurse or a doctor or someone who can show that there—there was some kind of penetration. I must have missed the memo. No, because that's not the facts, ladies and gentlemen. The facts are that we gave you the evidence. *A young woman sat right there and poured her heart out to all of you.* She gave the rendition of what happened nearly four years ago when she was just a little eleven-year-old in seventh grade. Sitting right there before you all, before fourteen strangers—before fourteen adults. You know what? *She should be commended for what she did, that she did it. Under fear. That she did it—never wanting to be here in this place. Never wanting things to get to this point. Never wanting those things to happen to her.* That first semester of her seventh-grade year—she never asked for this. Not once. Never.

The State immediately continued with the following:

> What happened? It's sad, ladies and gentlemen. It's very sad. *When mom was away, stepdad, he decided to play.* And he thought he could get away with it. He told her, don't tell anyone this will tear apart the family. And she had a legitimate concern as the big sister of not doing anything that would tear apart her family. And we heard from the detective—I think the quote was, children have a lot to lose in these kinds of situations. Children have a lot to lose when they disclose. Because they recognize that this is going to change the dynamic. This is gonna change everything. This is gonna rock the boat. And you know what I say to that? Thank God. Because if she didn't have the courage to speak up, when mom asked her. If she didn't have the courage to speak up when at the time Grandma Dora was there. Then you know what, he would have gotten away with it. He would have moved on. *You know what she did, she—she issued a cry for help. She issued a cry for help and her mom answered. She issued a cry for help, and Grandma Dora answered. She issued a cry for help and the Las Cruces Police Department answered. She issued a cry for help and my office—the Third Judicial District Attorney's office, answered that cry for help. Why? Because we have a duty to protect her. And now that cry for help extends to you all, as the members of this jury. Defense counsel stood up here and told you all these things that caused him hesitations. And I could tell you on the flip side, all the things that give me confidence for why this case should result in a guilty verdict.* But at the end of the day, neither his perception nor my perception nor my colleague's perception really matter because we are not the judges of the facts. You all are the judges of the facts. And ladies and gentlemen, we gave you what you

needed. Since when did memory no longer suffice? We're not just talking about someone saying, oh yeah, it might have been here or there. No, we're talking about someone who suffered nightmares because of what this man did to her. *Let me make it very plain and clear, ladies and gentlemen, right now, on this 24th day of August, you are sitting in the presence of a child molester. You are sitting in the presence—*

At that point, Defendant objected. The district court sustained the objection and instructed the jury to "please disregard that last statement." The State made the final challenged statement near the end of rebuttal closing argument: *"What does your guilty verdict say? Your guilty verdict says,* [*Victim*]*, honey, I'm so sorry that happened to you. I believe you. I believe you. What he did to you was wrong, and I believe you."* Defendant appeals the jury's conviction on all four counts.

## DISCUSSION

**{4}**     Defendant challenges multiple instances of the State's conduct during trial both individually and as a cumulative whole but acknowledges that only one objection was made. *See State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348 ("Where error is preserved at trial, an appellate court will review under an abuse of discretion standard."); *see also id.* ¶ 35 ("Fundamental error occurs when prosecutorial misconduct in closing statements compromises a defendant's right to a fair trial, and we will reverse a conviction despite defense counsel's failure to object."). Regardless of preservation, we first consider whether the comments could be understood to be erroneous, *see id.* ¶¶ 15-23, and whether any error was reversible. *Id.* ¶ 26; *see also State v. Tollardo*, 2012-NMSC-008, ¶ 27, 275 P.3d 110 (noting that generally, courts evaluate "claims of error by inquiring into how severely the defendant was affected thereby"). In the prosecutorial misconduct context, we evaluate whether potential error is reversible according to three factors: "(1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense." *Sosa*, 2009-NMSC-056, ¶ 26. Context, however, is paramount, and we endeavor to determine whether the "comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial." *Id.* ¶ 34. If this analysis demonstrates reversible error but that error was unpreserved, we review further for fundamental error and "will upset a jury verdict only (1) when guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process." *Id.* ¶ 35. We review Defendant's arguments as they have been presented to us on appeal, first considering the State's statements individually and second as a cumulative whole. *See State v. Trujillo*, 2002-NMSC-005, ¶ 48, 131 N.M. 709, 42 P.3d 814.

## I.     The Individual Challenges

**{5}**     As we have noted, Defendant challenges (1) the State's questioning of the detective and Dora; and (2) eight statements that the State made during closing and

rebuttal arguments, which Defendant maintains either directly vouched for Victim's testimony or "preyed on the emotions of the jury." We address each group of statements in turn.

## A.      The State's Questioning

**{6}**      We first note that Defendant does not argue that either witness's testimony should not have been admitted and instead only contends that the State asked questions that were designed to improperly "bolster" Victim's testimony. We therefore limit our review to whether the questions were improper and amounted to prosecutorial misconduct, but not whether the admission of the testimony itself was erroneous. *See State v. Day*, 1978-NMCA-018, ¶ 9, 91 N.M. 570, 577 P.2d 878 (declining to consider whether the admission of evidence was reversible error because "the issue is misconduct").

**{7}**      The State did not improperly elicit testimony from the investigating detective. Defendant contends that (1) because Victim's testimony aligned with the type of information that the detective described as credible, the State's questions to the detective were improper; and (2) the detective implicitly vouched for Victim by testifying first that he did not always bring charges after an investigation and later that this investigation resulted in charges being brought. Specifically, Defendant cites *State v. Ashley*, 1997-NMSC-049, 124 N.M. 1, 946 P.2d 205, which explained that "[a] prosecutor may not imply that guilt has been determined by a judicial officer," and that although a law enforcement officer is "different from a judicial officer, . . . it is improper for a law enforcement officer to give [an] opinion as to the ultimate issue in the case." *Id.* ¶¶ 18-19. On appeal, Defendant maintains that the State's questions "set up" the detective's testimony "not simply to corroborate [Victim's] testimony, but to bolster it" and thereby implied that Defendant's guilt had already been determined by the detective, whom Defendant suggests is "a judicial officer." Defendant, however, identifies no point at which the State elicited any opinion from the detective about Victim's credibility or a belief that Victim was truthful. *Cf. State v. Garcia*, 2019-NMCA-056, ¶ 12, 450 P.3d 418 (noting that expert testimony that opined on a victim's truthfulness was erroneously admitted). The detective's testimony instead provided a framework for the jury to evaluate the evidence and make its own credibility determination. *See State v. Dominguez*, 2014-NMCA-064, ¶ 24, 327 P.3d 1092 (noting that the state may point out "specific indicators presented to the jury throughout the trial as evidence of the truthfulness of [the v]ictim's account"). Along these lines, in closing, the State invited the jury to use the "good structure" that the detective provided "to think about this case." We therefore conclude that the State's questions to the detective were not erroneous.

**{8}**      While the State's question to Dora was error, it was not reversible error under the circumstances. The State directly asked for an opinion about Victim's credibility, which is improper. *See State v. Samora*, 2016-NMSC-031, ¶ 42, 387 P.3d 230 (noting that "[e]vidence will be excluded as improper bolstering when it directly comments on a witness's credibility"); *see also* UJI 14-5020 NMRA (instructing the jury that they are the

judges of credibility of the witnesses). The State, however, did not refer to Dora's statement in closing, and while the eliciting question was the final question on direct examination, and therefore Dora's statement may have lingered with the jury, it remained a single question and a single answer from a lay witness. *See Sosa*, 2009-NMSC-056, ¶ 34 ("[I]n the final analysis context is paramount."). For these reasons and because the question invaded no constitutional protection, was isolated, and brief, *see id.* ¶ 26, it did not "materially alter[] the trial or likely confuse the jury by distorting the evidence." *See id.* ¶ 34.

## B.      The State's Closing Argument

**{9}**      Defendant next identifies eight statements that he argues resulted in two types of prosecutorial misconduct during the State's closing and rebuttal arguments: vouching and emotional manipulation. Both categories of asserted misconduct are rooted in the State's obligation to encourage the jury to rely on the evidence, rather than either the prestige or special knowledge of the prosecutor's office or the emotional impact of the circumstances. *See State v. Paiz*, 2006-NMCA-144, ¶ 55, 140 N.M. 815, 149 P.3d 579 ("Generally speaking, vouching involves either invoking the authority and prestige of the prosecutor's office or suggesting the prosecutor's special knowledge." (internal quotation marks and citation omitted)); *Ashley*, 1997-NMSC-049, ¶ 15 (considering the state's reliance on character evidence to "insinuat[e] that [the defendant] was a wicked person" and observing that "[e]vidence which improperly appeals to the passions and prejudices of the jury should be excluded"). We view each statement through the lens of the State's obligation, as well as the entire context of the statement, to determine whether the State improperly asked the jury to reach a verdict based on considerations apart from the evidence presented. *See Sosa*, 2009-NMSC-056, ¶ 34.

**{10}**      The first challenged statement from closing argument, "She told you the truth," appears to vouch for Victim but was not reversible error. Generally, it is improper for the State to "personally vouch" for a victim's credibility. *See Dominguez*, 2014-NMCA-064, ¶¶ 23-24. In context, however, this portion of the State's closing directly addressed a matter that was alluded to in Defendant's opening and explored on cross-examination—Victim's difficulty recalling when the charged conduct occurred. The State attempted to put Victim's testimony about what she said happened to her in the context of her age and ability to recall—more akin to the State communicating, "She gave you her version of events" rather than, "I believe what she said was the truth." *See id.* ¶ 23 ("Prosecutors are permitted to comment on the veracity of witnesses so long as the statements are based on the evidence—not personal opinion—and are not intended to incite the passion of the jury."). In this context and in the absence of any objection or intervention by the court, it is likely that the jury understood the statement as we have described. *See Sosa*, 2009-NMSC-056, ¶¶ 16-23 (considering, in relevant part, the reactions of the court participants and context of the comment in order to discern "what the jury understood the comment to mean"). While credibility was central to this trial, "evaluated objectively in the context of the [State's] broader argument" and Defendant's presentation to the jury, this brief statement invaded no distinct constitutional protection and did not deprive Defendant of a fair trial. *See id.* ¶ 26.

**{11}** The second challenged statement did not vouch for Victim's credibility. In arguing that Victim "poured her heart out" to the jury and should be "commended" for reporting to law enforcement, the State did not "invok[e] the authority and prestige of the prosecutor's office or suggest[] the prosecutor's special knowledge." *See Paiz*, 2006-NMCA-144, ¶ 55 (describing the essential concerns that are associated with vouching (internal quotation marks and citation omitted)). As in *Paiz*, the State's comments "appear[] to constitute an appeal to popular psychology, suggesting that . . . victims would not have endured the trauma associated with the legal proceedings if they had not been driven in some sense by truth." *Id.* While perhaps of debatable "persuasive value," the State's comments within the second challenged statement did not "implicate the concerns associated with vouching." *See id.*

**{12}** While we agree with Defendant that the third challenged statement, "when mom was away, stepdad, he decided to play," also appears to have dubious persuasive value, we disagree that the statement establishes prosecutorial misconduct. Defendant argues the statement was designed to urge the jury "to convict for reasons other than the evidence" presented at trial. *See State v. Cooper*, 2000-NMCA-041, ¶ 15, 129 N.M. 172, 3 P.3d 149. To the contrary, however, the jury heard testimony that Victim's mother was incarcerated at the time that the abuse occurred and that Defendant was Victim's caretaker. As a result, the statement had a basis in the evidence and was not solely an emotional appeal. *See id.*

**{13}** The fourth and fifth challenged statements were both erroneous but not reversible. Each statement—both related to the "cry for help" argument—suggests an initial attempt by the State to vouch for Victim's credibility and encourage the jury to convict Defendant in order to satisfy a moral obligation. The fourth statement proposes that Victim's family, law enforcement, and the State believed that Victim told the truth and thereby gave Victim's testimony the prestige of law enforcement and the prosecutor's office. *See Paiz*, 2006-NMCA-144, ¶ 55. The fifth statement, which immediately followed, indicates that Victim's "cry for help" extended to the jury members and communicated that the jury should convict based not on the evidence but on the "duty" to protect Victim. *See State v. Allen*, 2000-NMSC-002, ¶¶ 109-110, 128 N.M. 482, 994 P.2d 728 (considering broad appeals to societal obligations and admonishing counsel to "confine their remarks to arguments based on the evidence presented in the cases before them"); *see also State v. Amador*, 2024-NMSC-006, ¶ 32, 546 P.3d 1277 (criticizing as "prejudicial and improper" closing argument that encouraged jurors to "shift the burden of proof and protect other children from [the d]efendant"). Nevertheless, the State almost immediately changed course and stated, "But at the end of the day, neither his perception nor my perception nor my colleague's perception really matter because we are not the judges of the facts. You all are the judges of the facts. And ladies and gentlemen, we gave you what you needed." We conclude that the fourth and fifth challenged statements do not constitute reversible error because, although the statements were not invited by Defendant, they invaded no specific constitutional right, were brief, and were largely corrected by the State almost immediately. *See Sosa*, 2009-NMSC-056, ¶ 26.

**{14}**  The sixth statement, related to the State's confidence in the evidence, was not erroneous and regardless was not reversible, because the comment responded to Defendant's argument about whether "hesitations" established reasonable doubt. The State referred not to its own belief that Defendant was guilty but "all the things" that supported the argument for a guilty verdict. *See Dominguez*, 2014-NMCA-064, ¶ 24 (explaining that the state may "focus[] on [the] specific indicators presented to the jury throughout the trial as evidence of the truthfulness of [the v]ictim's account"). The comment on the evidence was therefore not a personal opinion that Defendant committed the crime. *See State v. Gonzales*, 1986-NMCA-050, ¶ 18, 105 N.M. 238, 731 P.2d 381 ("A prosecutor may comment on the evidence, and counsel is entitled to wide latitude in closing argument."), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110; *Dominguez*, 2014-NMCA-064, ¶ 23 (permitting the state to comment on credibility provided that the comment is based on the evidence and "not personal opinion"). The comment was invited by Defendant's focus on the jury instruction that defined the State's burden of proof as "doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life." In this context, the State's sixth challenged statement addressed Defendant's attack on the evidence and was not improper. *See Sosa*, 2009-NMSC-056, ¶ 26.

**{15}**  The district court properly sustained Defendant's objection to the seventh challenged statement, that the jury sat "in the presence of a child molester," and instructed the jury to disregard the erroneous comment. Defendant contends that the curative instruction was an insufficient remedy and that reversal is warranted because the statement "was no slip of the tongue." A prosecutor may not rely on belittling and "vituperative language" if it has the effect of inflaming the jury, *State v. Diaz*, 1983-NMCA-091, ¶ 15, 100 N.M. 210, 668 P.2d 326, and a curative instruction does not overcome prejudice when it "fail[s] to inform the jury adequately of its duty to disregard the improper comment," *State v. Gutierrez*, 2007-NMSC-033, ¶ 23, 142 N.M. 1, 162 P.3d 156. The State's comment was undoubtedly improper, as the district court recognized, but it was brief, unlike in *Diaz*, in which the state made multiple disparaging references to the defendant. *See* 1983-NMCA-091, ¶¶ 14-15; *see also Amador*, 2024-NMSC-006, ¶ 32 (noting that "[t]he prosecutor referred to [the d]efendant as a pedophile *five* times in his closing argument and rebuttal"). While the statement was deliberate, the district court's instruction to the jury to disregard the statement was immediate and clear, Defendant sought no additional remedy, and the seventh challenged statement did not invade a constitutional protection. We therefore discern no reversible error. *See Sosa*, 2009-NMSC-056, ¶ 34.

**{16}**  We last conclude that the eighth challenged statement was not erroneous. Defendant argues that the State's final words in rebuttal closing argument about what a guilty verdict would "say" to Victim were an improper emotional appeal to the jury. We agree that the notion that the jury's verdict would "say" something, or send a message, would be improper in the abstract. *See Allen*, 2000-NMSC-002, ¶¶ 109-110 (agreeing that "message" arguments are improper "inasmuch as they attempt[] to persuade the jury to reach a verdict based on biases or prejudices to which the jurors may have been susceptible because of their experiences as parents or members of a particular

community or religion"). The words the State used, however, required the jury to believe Victim in order to find Defendant guilty: "What does your guilty verdict say? Your guilty verdict says, [Victim], honey, I'm so sorry that happened to you. I believe you. I believe you. What he did to you was wrong, and I believe you." As Defendant notes, "The only factual determination in this case was whether the jury found [Victim] credible." Thus, despite the dramatic delivery, the State's eighth challenged statement encouraged the jury to rely on Victim's testimony in order to convict Defendant, and as a result, was not improper. *Cf. id.* ¶ 110 (disapproving of such comments and admonishing counsel to argue "the evidence presented in the cases before them").

## II.     The State's Cumulative Presentation

**{17}**     Defendant additionally argues that the cumulative effect of the challenged statements was improper and prejudicial. We have already determined that no error resulted from the questioning of the detective or the closing argument statements that Victim "poured her heart out," Defendant "played," the State had confidence in the evidence, and the verdict's message to Victim. We consider the remaining statements and questions in the cumulative balance: (1) the State's question to Dora about whether Victim was lying; (2) the closing statement that Victim "told you the truth"; (3) the two statements related to Victim's "cry for help"; and (4) the reference to Defendant as a "child molester." Returning to the *Sosa* factors, we have already established no distinct constitutional violations occurred. The remaining factors are of less utility in the cumulative analysis.

**{18}**     As we have noted, the *Sosa* factors are intended to be "useful guides" to evaluate whether "the prosecutors' comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial." 2009-NMSC-056, ¶ 34. But the brevity of individual statements no longer easily tips the balance away from reversible error when those statements are aggregated and when so many of them relate to the same issue—Victim's credibility. On the one hand, the question to Dora and the first three statements by the State relate directly to vouching for Victim and the last two occurred during rebuttal over the course of approximately ninety seconds. On the other hand, the second statement was responsive to Defendant's presentation at trial, the State almost immediately redirected the third statement, and Defendant objected to the fourth, which was swiftly corrected by the district court. As is apparent here, the "balance between these competing considerations" is difficult to achieve. *See id.* ¶ 25; *see also id.* ¶ 24 (observing that closing argument is uniquely situated to influence the jury's decision but that "closing argument, and rebuttal argument in particular, is necessarily responsive and extemporaneous, not always capable of the precision that goes into prepared remarks").

**{19}**     "Because [district court] judges are in the best position to assess the impact of any questionable comment, we afford them broad discretion in managing closing argument," which includes "striking statements and offering curative instructions." *See id.* ¶ 25. The balance is further achieved by instructing the jury, as the district court did in the present case, to rely on the evidence and not arguments of counsel. *See id.* We

also look to the reactions of the parties and the court during trial—not to determine whether an objection preserved an error for our review but instead to investigate the context of the challenged conduct to better evaluate "what the jury understood the comment to mean" in the courtroom when the comment was made. *See id.* ¶¶ 20-21. That only one statement drew an objection from Defendant and a response from the district court supports a view that in the rapid context of the trial, the other statements did not create the prejudicial narrative that may be suggested when looking backward on appeal. *See id.* ¶ 20. In the final instructions, the district court directed that the jury was to assess credibility, that the jury members were "the sole judges of the facts in this case," and that the facts were to be determined based on "the evidence produced here in court." We look to all of this information because "[o]nly in the most exceptional circumstances should we, with the limited perspective of a written record, determine that all the safeguards at the trial level have failed." *Id.* ¶ 25. In the present case, we have the additional benefit of audio recordings, including the State's emotionally charged delivery on rebuttal. Nevertheless, in light of the safeguards provided and the challenged conduct at issue, we conclude that the cumulative impact of the State's conduct does not require reversal of the jury's verdict.[2] *See id.*

**CONCLUSION**

**{20}** We affirm.

**{21}** **IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Chief Judge**

**SHAMMARA H. HENDERSON, Judge**

---

2Despite not finding fundamental error here, we caution the trial prosecutor to be careful when presenting to a jury about a victim's credibility in the future.